# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### WHEELING DIVISION

**MELINDA KARPINSKI,**

       **Plaintiff,**

**v.**                                   **Civil Action No. 5:11-cv-66**
                                              **JUDGE STAMP**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [8], GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [9], <u>AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE</u>**

## I.   <u>INTRODUCTION</u>

On May 5, 2011, Plaintiff Melinda Karpinski ("Plaintiff"), by counsel Christopher J. Wallace, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1.) On September 7, 2011, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the administrative record of the proceedings. (Answer, ECF No. 5; Administrative Record, ECF No. 6.) On September 30, 2011, and October 28, 2011, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 8; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 9.) Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   <u>BACKGROUND</u>

## A.    Procedural History

On July 25, 2007,[1] Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI"), alleging disability that began March 14, 2006.  (R. at 151-54, 155-57.)  Both claims were initially denied on October 18, 2007 and again upon reconsideration on January 9, 2008.  (R. at 100-09, 113-18.)  On January 15, 2008, Plaintiff filed a request for a hearing, which was held before United States Administrative Law Judge ("ALJ") J.E. Sullivan on May 6, 2009 in Wheeling, West Virginia.[2]  (R. at 36, 119, 125, 129.) Plaintiff, represented by Christopher Wallace, Esq., appeared and testified, as did Eugene Czuczman, an impartial vocational expert.  (R. at 34.)  On June 19, 2009, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act ("Act").  (R. at 14-29.)  On March 9, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1.) Plaintiff now requests judicial review of the ALJ's decision denying her applications for DIB and SSI.

## B.    Personal History

Plaintiff was born on September 6, 1963 and was 43 years old when she filed her DIB and

---

[1]  The ALJ's decision lists a date of July 18, 2007 for when Plaintiff filed her applications for DIB and SSI. (R. at 14.)  However, her applications, contained as Exhibits 3D and 5D in the Administrative Record, both refer to a date of July 25, 2007.  (R. at 151, 155.)  The only mention of July 18, 2007 is in Plaintiff's application for SSI and refers to Plaintiff's "fugitive felon/parole or probation violator" status as of that date.  (R. at 152.)

[2]  The cover sheet for the transcript of the hearing before the ALJ notes that it was held in Pittsburgh, Pennsylvania on November 12, 2009.  (R. at 34.)  However, during the hearing, the ALJ noted that they were located at the federal courthouse in Wheeling, West Virginia.  (R. at 36.)  Furthermore, the ALJ's written decision notes that the hearing was held in Wheeling.  (R. at 14.)

SSI applications.  (R. at 151, 155.)  She completed high school and has prior work experience as a cleaner at a bakery, a food service employee at a hospital, and in a home health care business.  (R. at 199, 209.)  Plaintiff completed cosmetology training while in high school but no longer has her license.  (R. at 209.)  She is married to William Joseph Karpinski and does not have any dependent children.  (R. at 151, 156.)

## C.   *Medical History*

### 1.    **Relevant Medical History Pre-Dating Alleged Onset Date of March 14, 2006**

On February 1, 2005, Plaintiff saw Dr. John Schultz for "chronic low back pain secondary to lumbar disc disease and lumbar strain."  (R. at 479.)  Plaintiff noted that she had not been working since January 25, 2005 because of the exacerbation of pain.  (*Id.*)  Dr. Schultz found "palpation tenderness and spasm in the entire lumbosacral area from approximately L2 down to the iliac crest." (*Id.*)

On February 8, 2005, Plaintiff saw Dr. Schultz for a preoperative physical examination.  (R. at 480.)  Dr. Schultz noted a normal neurological exam, but an exam of Plaintiff's back was "remarkable for significant tenderness and spasm in the lumbosacral area." (*Id.*)

On February 14, 2005, Plaintiff underwent "a status post L4-5 lumbar laminectomy with microdiskectomy of the right L4-5 level and instrumentation at the L4-5 with interbody fusion related to mechanical low back pain."  (R. at 382; *see also* R. at 86.)  The surgery was performed by Dr. Hikmat El-Kadi, and he noted that Plaintiff "tolerated the procedure well with no complications."  (R. at 386.)

On February 22, 2005, Plaintiff presented at the emergency room of the Weirton Medical Center with back pain.  (R. at 442.)  She had a negative bilateral straight leg exam, but there was no

evidence of infection from her surgical incision. (R. at 443.) An overall impression was that Plaintiff's pain was from her recent surgery. (*See id.*) Two days later, a radiology report noted that Plaintiff had "spondylosis and disc narrowing similar to the prior exam of 8/5/03." (R. at 441.)

On March 1, 2005, Dr. El-Kadi saw Plaintiff for a postoperative visit. (R. at 382.) Plaintiff noted that she felt "80% better when compared with prior to surgery." (*Id.*) Dr. El-Kadi noted that the screws and graft were in a good position and that he was "very pleased" with Plaintiff's progress. (*Id.*) A week later, Plaintiff had another postoperative visit with Dr. El-Kadi. (R. at 381.) She reported that she was having bilateral hip pain, with more severe pain in her right hip, and that the pain was worse at night. (*Id.*) Dr. El-Kadi again noted that he was "very pleased" with Plaintiff's progress. (*Id.*) A day later, Plaintiff met with Dr. Schultz, where she reported "feeling better" overall. (R. at 478.)

On April 5, 2005, Plaintiff had an MRI of her lumbar spine performed at Weirton Medical Center. (R. at 390-92, 438-40.) Dr. Mark Benson noted that Plaintiff's screws were in position, but also noted "some narrowing of the L4-5 disc space with some questionable subtle irregularity of the vertebral body end plates." (R. at 390, 438.) Overall, he noted "post-surgical changes at L4-5 level from lumbar fusion." (R. at 392, 440.) When Dr. El-Kadi reviewed Plaintiff's MRI on April 20, 2005, he noted that there was "no evidence of lumbar stenosis or foraminal narrowing." (R. at 379.)

On April 12, 2005, Plaintiff saw Dr. Schultz for her back pain. (R. at 477.) She reported having some residual pain in her back and right lateral thigh area, but also stated that she was "doing pretty well since her surgery." (*Id.*) Dr. Schultz noted a normal neurological exam and that there was some "generalized tenderness" in Plaintiff's "lower lumbar sacral area." (*Id.*)

On April 28, 2005, Plaintiff presented at the emergency room of the Weirton Medical Center

with back pain.  (R. at 435.)  An examination found that Plaintiff "does have decreased sensation to her right leg to light touch."  (R. at 436.)  Plaintiff was able to ambulate to the bathroom, but also needed assistance with standing.  (R. at 436-37.)

Physical therapy records, included in the administrative record as Exhibits 1F and 2F, indicate that Plaintiff attended regular physical therapy sessions at Summit Physical Therapy in Weirton, West Virginia with Mark Mascio, LPT and Nicole Mastrantoni, MPT.  (R. at 284-335.) She began physical therapy for "evaluation and treatment of low back pain" following her "posterior spinal fusion/laminectomy surgery."  (R. at 327.)  These notes from Plaintiff's appointments show that she "tolerated treatment well."  (R. at 284, 2863-306, 310-27, 333-35.)  Specifically, on June 24, 2005, Mascio reported that Plaintiff's "progress has been good."  (R. at 328.)  During the majority of these appointments, Plaintiff did not describe any new complaints, reported a decrease in pain, or reported a decrease in symptoms.  (*See, e.g.,* R. at 284, 286-88, 290, 295-96, 298, 303-06, 310-12, 314, 316-20, 322.)  On May 4, 2005, Plaintiff stated that she was "able to tolerate all activities at this time."  (R. at 311.)  On May 20, 2005, Plaintiff described "an increase in the ability to perform activities of daily living."  (R. at 301.)

On May 11, 2005, Plaintiff saw Dr. Schultz for a follow up appointment.  (R. at 476.)  He noted that she was still having some pain but that it was improving after being placed on Neurontin. (*Id.*)  Plaintiff also reported that she was still using a TENS unit and doing therapy, and she also had plans on going back to work on an unrestricted basis after June 28, 2005.  (*Id.*)  Dr. Schultz found some mild tenderness in her back but did not complete a full exam because of her TENS unit.  (*Id.*)

On June 14, 2005, Plaintiff had a follow-up appointment with Dr. Thomas Neis at the Weirton Medical Center.  (R. at 389, 434.)  Dr. Neis noted "no significant change in position and

alignment of the lumbar spine" when compared to the study done on April 5, 2005. (*Id.*)

On June 21, 2005, Mascio prepared a Functional Capacity Evaluation Summary Report of Plaintiff for Dr. Hikmat El-Kadi of the Tri-State Neurological Associates in Pittsburgh, Pennsylvania. (R. at 336-76.) Mascio noted that Plaintiff put forth a "full physical effort" and that her subjective reports of "pain and associated disability" appeared to be "both reasonable and reliable." (R. at 337.) He determined that Plaintiff "demonstrated the capacity to meet the Medium Physical Demand Strength Rating per the DOT." (R. at 338; *see also* R. at 374.) During the evaluation, Plaintiff "demonstrated good body mechanics, good control of the load, and reported a Functional Pain Rating of 0.5, which is non-disabling." (R. at 338, 375.) He also noted that Plaintiff showed normal posture in her lumbar spine. (R. at 362.) Mascio determined that Plaintiff demonstrated an ability to perform "the majority of the physical demands" of a food service worker at a hospital. (R. at 338, 374.) Specifically, he found that Plaintiff would able to return to this position because she "could tolerate standing" and could walk without difficulty "as long as she can utilize her compensatory strategies of off loading or weight shifting and massaging/holding her low back" so that she can tolerate prolonged periods of standing. (R. at 338, 374.)

On July 18, 2005, Plaintiff presented at the emergency room of the Weirton Medical Center for back pain. (R. at 431.) She reported that her pain was aggravated and that she was "having increasing pain and discomfort of the lower back." (R. at 432.) Plaintiff had a negative straight leg raising test, but had otherwise intact sensation in her right leg. (*Id.*) Notably, there were "[n]o focal neurological deficits other than that related from her prior back problems." (*Id.*)

On July 20, 2005, Plaintiff saw Dr. El-Kadi for a postoperative appointment. (R. at 377.) At this appointment, Plaintiff told Dr. El-Kadi that she had been having pain in her lower back that

radiated to her bilateral hips and down to her left thigh. (*Id.*) She also reported pain in her right leg that radiated down to her right knee, with "numbness and tingling just over the lower extremity and the toes." (*Id.*) Plaintiff noted that she had returned to work on June 29, 2005 but that it "was not going well." (*Id.*) Dr. El-Kadi advised Plaintiff to continue physical therapy and work hardening and to return to work. (*Id.*) Plaintiff was "amenable to these recommendations." (*Id.*)

On August 3, 2005, Dr. Schultz noted that Plaintiff was not doing well at work because of the lifting and other physical activities. (R. at 475.) He found significant tenderness and spasm in Plaintiff's back despite her use of a TENS unit and back brace. (*Id.*) However, he also noted that Plaintiff was "doing pretty well" and had no new complaints. (*Id.*) Two weeks later, Dr. Schultz had Plaintiff return to work with restrictions. (R. at 474.)

On September 19, 2005, Dr. Schultz noted that Plaintiff was having a "lot of back pain and difficulties" after going back to work on restricted duty. (R. at 473.) He noted a normal neurological exam but also some general tenderness in Plaintiff's back "with decreased range of motion in all ranges." (*Id.*)

On October 6, 2005, Dr. Carol Korzi evaluated Plaintiff's injuries. (R. at 404-14.) Plaintiff told Dr. Korzi that her "complaints worsen with activity" and that her "pain interferes with some activity and prevents other." (R. at 405.) Dr. Korzi noted a total lumbar ROM impairment of 14%, a total sensory impairment of 4%, and a total motor impairment of 3%. (R. at 405-07.) Overall, she determined that Plaintiff had a final impairment of 30%. (R. at 408.)

On October 10, 2005, Plaintiff presented at the emergency room of the Weirton Medical Center for her back pain. (R. at 427-28.) She stated that she was experiencing back pain "all the time" and that her pain became worse from pushing a heavy cart at work. (R. at 428.) A neurologic

exam was normal, and Plaintiff was able to complete a straight leg raise "bilaterally at 40 degrees." (*Id.*) Plaintiff's back was tender "to the bilateral paralumbar area at level L1-L5," but there was no swelling or deformities. (*Id.*)

On October 19, 2005, Dr. Schultz saw Plaintiff for a follow up appointment. (R. at 472.) He noted that she had been having difficulty performing tasks on her restricted duty list at work. (*Id.*) In Dr. Schultz's opinion, the work restrictions placed on Plaintiff appeared to be permanent. (*Id.*) However, he noted that Plaintiff had "every intention and every desire to get back to work and is very motivated to do so." (*Id.*)

On December 14, 2005, Dr. Schultz noted that Plaintiff was back to work at Weirton Medical Center and was performing "mostly sedentary work." (R. at 470.) She reported a "mild increase in pain," but also that she was "doing pretty well." (*Id.*) Dr. Schultz noted a normal neurological exam and that Plaintiff's back was "still generally tender in the lumbosacral area with decreased range of motion." (*Id.*) Plaintiff also told Dr. Schultz that she may not need to work anymore once her husband got established in his new position as a truck driver and got his insurance. (*Id.*)

On December 26, 2005, Plaintiff presented at the emergency room of the Weirton Medical Center "with complaints of low back pain with radiation to her mid back and both legs." (R. at 425-26.) An examination revealed "mild tenderness to palpation of the lower lumbar paraspinous muscles." (R. at 426.) Plaintiff also demonstrated good bilateral straight leg raises. (*Id.*)

On January 10, 2006, Plaintiff told Dr. Schultz that she had been "doing slightly better overall." (R. at 469.) He noted some mild spasm and tenderness in her back, but that it was also improved. (*Id.*) Dr. Schultz also found that Plaintiff had a decreased range of motion. (*Id.*)

Plaintiff saw Dr. Korzi again on February 7, 2006. (R. at 393). She reported increased pain

from attempting to do housework and that she could not carry laundry down the stairs. (R. at 394.) Plaintiff also noted difficulties with tying her shoes and sleeping. (*Id.*) Although Dr. Korzi found a lumbar ROM impairment of 15%, a sensory impairment of 4%, and a motor impairment of 3%, she still found a final impairment of 30%. (R. at 394-97.)

On March 10, 2006, Plaintiff told Dr. Schultz that she had been doing "fairly well." (R. at 468.) He noted that she still had a decreased range of motion and that her back still displayed signs of "generalized tenderness and mild spasm." (*Id.*)

### 2. Relevant Medical History Post-Dating Alleged Onset Date of March 14, 2006

On May 13, 2006, Plaintiff saw Dr. Schultz and noted that she was "actually doing very well today." (R. at 467.) She decided to quit work at Weirton Medical Center and felt "very relieved." (*Id.*) Her husband got a job with a trucking company and so she was going to be traveling with him. (*Id.*) Dr. Schultz's exam of Plaintiff's back noted some tenderness and decreased range of motion, but he also found that she was improving. (*Id.*)

Plaintiff saw Dr. Schultz again on October 4, 2006. (R. at 465.) He noted that she had "been doing pretty well" since her last examination in May, but that she had increased pain "in the lumbosacral area radiating down to her legs" after having a worker's compensation evaluation. (*Id.*) However, he reported that she had not been using her prescription medications as much during that time. (*Id.*) Dr. Schultz noted significant tenderness to palpation in Plaintiff's back. (*Id.*) She also had significant spasm, especially in the left side of her back. (*Id.*) Dr. Schultz particularly noted that Plaintiff receives "pretty good relief" from heat, her TENS unit, and a massaging unit. (*Id.*)

On October 27, 2006, Plaintiff told Dr. Schultz that she reduced her prescription dosages because of side effects and because "she was feeling better." (R. at 464.) She continued to do well

with the lower doses and was "feeling better" through her prescriptions and use of her TENS, massage, and heat units. (*Id.*) Dr. Schultz found that her back showed "improved range of motion almost to what she was before this acute exacerbation." (*Id.*) Plaintiff only displayed mild tenderness to palpation and no spasm. (*Id.*) Even though she still showed "some mild pain with range of motion," she was "much improved." (*Id.*)

On November 18, 2006, Plaintiff told Dr. Schultz that she was experiencing "significant pain" after being "extremely manipulated" at a worker's compensation evaluation. (R. at 463.) She described continued pain in her back and shooting pain in her legs with a lot of spasm. (*Id.*) Overall, Dr. Schultz noted a "marked worsening from her most recent and recent exams." (*Id.*)

On December 5, 2006, Plaintiff told Dr. Schultz that she was "doing a lot better" since her last appointment. (R. at 462.) She strained her back a bit from coughing. (*Id.*) After performing an exam, Dr. Schultz found that Plaintiff's pain was "much decreased in all ranges of motion" and that she had "minimal spasm." (*Id.*) He also noted that the tenderness in the lumbosacral area was much improved from her previous exam. (*Id.*)

On January 26, 2007, Plaintiff told Dr. Schultz at a follow up appointment that she was "doing better overall." (R. at 461.) He noted that she was "doing well with the combination of the medications, TENS unit and also some heat treatments." (*Id.*) After performing an exam of Plaintiff's back, Dr. Schultz reported improvement despite "mild lumbosacral tenderness and minimal spasm." (*Id.*)

On July 31, 2007, Plaintiff saw Dr. Schultz for a follow up appointment. (R. at 460.) She reported that she had not been using her TENS unit and had not been taking her Vicodin. (*Id.*) Plaintiff noted increased symptoms and that it was becoming more difficult to "get around and do

things." (*Id.*) After an examination, Dr. Schultz noted generalized tenderness in Plaintiff's lumbosacral area, especially in the "lower portion of the lumbosacral area bilaterally." (*Id.*) He also noted some mild spasm in that area. (*Id.*) That same day, Dr. Schultz submitted a letter stating that Plaintiff "is currently unable to work because of persistent low back pain and lower extremity pain and weakness secondary to a history of lumbosacral disc herniation." (R. at 554.) He opined that she was "not improving to the point where she is able to maintain gainful employment of any kind at this time." (*Id.*) Dr. Schultz noted that he thought Plaintiff had a permanent disability and would "be unable to work in the future." (*Id.*)

On August 21, 2007, Plaintiff saw Dr. Schultz for exacerbation of her lower back pain. (R. at 459.) He noted that her use of the TENS unit and exercising were not helping and that her prescriptions only helped to ease the pain. (*Id.*) He noted significant tenderness and spasm in her lumbosacral area and also "mild-to-moderate and slightly worsened spasm in the lower lumbosacral area." (*Id.*)

On September 4, 2007, Dr. Gabriel Sella from the state agency completed a disability determination examination of Plaintiff. (R. at 501-04.) Dr. Sella noted that Plaintiff was able to walk into and out of the examination room without difficulty, but that she did have "decreased motor responses and sensory responses." (R. at 504.) Plaintiff could not perform certain tests, including squatting, because of pain in her left hip and knee. (*Id.*) Overall, Dr. Sella noted that Plaintiff could occasionally stand and walk, could lift and carry only very light objects, and could handle light objects. (*Id.*)

On September 19, 2007, Dr. Fulvio Franyutti completed a Physical Residual Functional Capacity assessment of Plaintiff. (R. at 505-12.) He noted that Plaintiff could occasionally lift and

carry twenty pounds, could frequently lift and carry ten pounds, could stand and/or walk and sit about six hours in an eight-hour workday, and was not limited in pushing and/or pulling. (R. at 506.) Dr. Franyutti found that Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, and crawl, but can never climb ladders, ropes, and scaffolds and can never crouch. (R. at 507.) She should avoid concentrated exposure to extreme cold, vibration, and hazards. (R. at 509.) Dr. Franyutti found Plaintiff to be partially credible and that her allegations were partially supported by his findings. (R. at 510.)

On September 21, 2007, Plaintiff saw Dr. Schultz for "exacerbation of lower back pain with history of lumbosacral disc herniation." (R. at 531.) She noted that she was using her TENS unit and that gave "some relief." (*Id.*) Dr. Schultz assessed chronic lower back pain exacerbation with a history of lumbosacral disc herniation, began Plaintiff on a prescription for Cymbalta, and continued her other medications and TENS unit use. (*Id.*)

On September 29, 2007, Plaintiff had an MRI of her lumbar spine performed by Dr. Young Lee. (R. at 513; 529.) Dr. Lee noted a "focal degenerative spur involving the right paracentral area of L4-5 giving rise to a mild to moderate degree of stenosis to the right lateral recess." (*Id.*)

On October 22, 2007, Plaintiff had a follow up appointment with Dr. Schultz. (R. at 530.) She told Dr. Schultz that she was "feeling a lot better" and that her Cymbalta prescription "really helped her pain." (*Id.*) Plaintiff also reported that "[h]er back is doing better overall and she is pleased with how she is feeling." (*Id.*) Dr. Schultz assessed chronic lower back pain exacerbation with a history of lumbar disc herniation and continued Plaintiff on her medications. (*Id.*) He also advised her that she may have occasional exacerbations. (*Id.*)

On January 7, 2008, Dr. A. Rafael Gomez completed a Physical Residual Functional

Capacity assessment of Plaintiff. (R. at 546-53.) He assessed the same exertional limitations as Dr. Franyutti's previous assessment. (R. at 547.) Dr. Gomez also assessed the same postural limitations, with the exception of his findings that Plaintiff could occasionally crouch and can never crawl. (R. at 548.) He also assessed that Plaintiff did not have any limitations to being exposed to extreme cold. (R. at 550.) Overall, Dr. Gomez found no change in Plaintiff's residual functional capacity from September 19, 2007, where she was reduced to light work. (R. at 551.)

On April 27, 2009, Dr. Schultz completed a functional capacity evaluation of Plaintiff. (R. at 555.) He found that Plaintiff could stand and/or walk for a total of one hour in an eight-hour workday, that she could stand or walk for ten minutes at one time, that she could sit for a total of two hours in an eight-hour workday, and sit for ten minutes at one time. (*Id.*) Dr. Schultz noted that Plaintiff could never use her feet for repetitive movements. (*Id.*) He also determined that she could occasionally work above the shoulder level, but that she could never bend/twist/turn at her waist, squat, crawl, climb, and push/pull. (*Id.*) Also on that day, Dr. Schultz noted that Plaintiff's need to lay down at least two times for an hour to an hour and a half each day was a "reasonable physical limitation in an eight hour day." (R. at 556.)

## D.    *Testimonial Evidence*

At the hearing before the ALJ on May 6, 2009, Plaintiff testified that her position in food service at the Weirton Medical Center involved light work, such as cleaning phones and placing stickers. (R. at 47-48.) She did this work for about a week before moving to office work, which involved answering phones and preparing menus. (R. at 48-49.) Plaintiff testified that she was not able to sit and stand as she needed, but after further questioning admitted that she could have stood up while answering the phone if she needed to. (R. at 49.) She left this position on March 2, 2006

because of her pain.  (R. at 50.)

Plaintiff testified that she wears two lidoderm patches for her pain and also takes Cymbalta and Aleve.  (R. at 51.)  She experiences pain from her middle back down to her knees, and her legs will often go numb.  (R. at 51-52.)  Plaintiff uses a TENS unit, but worker's compensation has denied her attempts to be referred to a pain management unit.  (R. at 54.)  She uses the TENS unit three times a week for six hours per usage.  (R. at 65.)  She testified that lying down makes the pain better, but that afterwards she still feels that she cannot resume activity around her house.  (R. at 52.)  She can sit for about ten minutes before having to change position because of pain, and she can stand for about five to ten minutes before having to change positions.  (R. at 55-56.)  She stated that she could not recall the last time she visited the surgeon who performed her back surgery, and that Dr. Schultz has not referred her to that surgeon or another orthopedic surgeon since 2005.  (R. at 75.)

Plaintiff testified that she does not belong to any clubs or organizations, has no hobbies, and very seldom has visitors.  (R. at 57-58.)  She visits her mother once a week.  (R. at 58.)  Plaintiff still has a driver's license, and she will drive two miles to her attorney's office or a block and a half to pick up her medication.  (*Id.*)  She has been provided a handicapped sticker for her car.  (R. at 58-59.)  Plaintiff testified that on an average day, she will wake up around nine or ten in the morning.  (R. at 71.)  She does not eat breakfast, and she spends most of her day on the couch with her legs propped so she can watch television.  (R. at 71-72.)  At times, she will fold laundry.  (R. at 72.)  She will visit her mother on the weekends when her husband is home from his job as a truck driver.  (R. at 73-74.)  Plaintiff will do the dishes, but this takes her a few hours because she has to take breaks to sit down.  (R. at 53.)

### E.    *Vocational Evidence*

Also testifying at the hearing before the ALJ was Eugene Czuczman, a vocational expert. (R. at 76.) Mr. Czuczman testified that he had received the opportunity to review Plaintiff's file and to listen to her testimony at the hearing. (R. at 77.) He defined the local region for his testimony as West Virginia and the counties of Carroll, Belmont, Guernsey, Jefferson, Monroe, Noble, and Washington in Ohio and the counties of Allegheny, Washington, and Beaver in the Pittsburgh, Pennsylvania metropolitan area. (*Id.*) Mr. Czuczman also asserted that his testimony was consistent with the *Dictionary of Occupational Titles*. (R. at 87.)

Mr. Czuczman described Plaintiff's past work as the cleaning person for the bakery as light exertional, unskilled work. (R. at 78.) He classified her original work with the hospital, defined as a cook, as medium exertional, skilled work. (*Id.*) However, her light duty position, classified as an office clerk, was light exertional, semiskilled work. (*Id.*) Her work as a home health aid was classified as medium exertional, low semiskilled work. (*Id.*)

The ALJ first asked Mr. Czuczman to presume that Plaintiff could perform light exertional work; that is, that she could occasionally lift and carry twenty pounds, frequently carry and lift ten pounds, stand and/or walk and sit with normal breaks for about six hours in an eight-hour workday. (R. at 79.) He also included no climbing of ladders, ropes, and scaffolds; and occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. (*Id.*) Finally, Mr. Czuczman was to assume that Plaintiff should avoid concentrated exposure to hazards and vibration. (*Id.*) With this residual functional capacity ("RFC"), Mr. Czuczman testified that Plaintiff would still be able to perform her past work as the bakery cleaner and office clerk. (R. at 79-80.) She would also be able to perform occupations such as mail sorter, photographic machine operator, and

folding machine operator.  (R. at 80.)

The ALJ then added a sit/stand option "throughout the day without breaking task to allow Ms. Karpinski the ability to change position if so needed.  (R. at 80-81.)  Mr. Czuczman testified that Plaintiff could no longer perform her past work as a bakery cleaner or office clerk, but that she still would be able to work as a mail sorter, photographic machine operator, or folding machine operator.  (R. at 81.)

For his third RFC, the ALJ added that Plaintiff "should be allowed to use a cane or other assistive device throughout the day when she's ambulating away from her workstation." (R. at 81.) Based on this limitation, Mr. Czuczman testified that Plaintiff could still perform work as a mail sorter, photographic machine operator, and folding machine operator.  (R. at 81-82.)

As the fourth hypothetical, the ALJ changed the exertional level from light to sedentary.  (R. at 82.)  He also incorporated the same postural and environmental limitations from the first hypothetical.  (*Id.*)  Given these limitations, Mr. Czuczman testified that Plaintiff could perform work as a type copy examiner, patcher, and final assembler.  (R. at 82-83.)  He stated that these positions would be unskilled labor.  (R. at 83.)

As his fifth hypothetical, the ALJ added a sit/stand option to the fourth hypothetical he posed to Mr. Czuczman.  (R. at 83-84.)  Given this limitation, Mr. Czuczman testified that Plaintiff would still be able to perform work as a patcher and type copy examiner, but would not be able to perform as a final assembler.  (R. at 84.)  Furthermore, she would be able to perform work as a laminator, which would also be an unskilled position.  (*Id.*)

For the sixth hypothetical, the ALJ asked Mr. Czuczman to assume that Plaintiff was "fully credible about both her pain complaints and functional limitations." (R. at 84-85.) Specifically, Mr.

Czuczman was to assume that Plaintiff has "constant pain" radiating from her back to her knees, that she has to lay down for at least an hour to an hour and a half each day to alleviate the pain, that she has low energy because of her pain, that she can only sit for ten minutes and stand for five to ten minutes at a time, and that she has depression and daily crying spells. (R. at 85.) Mr. Czuczman testified that if Plaintiff's testimony were true, there would not be any work Plaintiff would be capable of performing. (*Id.*)

Plaintiff's attorney then questioned Mr. Czuczman. (R. at 86.) She asked Mr. Czuczman to assume that Plaintiff can only stand/walk for up to one hour during an eight-hour day and then for ten minutes at a time. (*Id.*) She also asked him to assume that Plaintiff could sit for two hours out of an eight-hour day and then for ten minutes at a time, that she could perform at the light exertional level, and that she could not use foot pedals. (*Id.*) Finally, Plaintiff's attorney asked Mr. Czuczman to assume that Plaintiff could only occasionally work above the shoulder level, could never bend and twist at the waist, and could never squat, crawl, climb, push, or pull. (*Id.*) Based on these limitations, Mr. Czuczman testified that there were no jobs that Plaintiff would be capable of performing. (*Id.*) Finally, Mr. Czuczman represented that there were no jobs Plaintiff would be capable of performing if she must lay down at least twice a day for an hour to an hour and a half each time. (R. at 86, 87.)

A report of contact form, dated September 20, 2007, details Plaintiff's work as a food service worker and as a nurse's aid. (R. at 234.) Her work in both positions was characterized at the medium exertional level. (*Id.*) The report of contact form noted that Plaintiff could not perform her past work as she actually performed it or as it is generally performed in the national economy. (*Id.*) However, the form reported that Plaintiff could perform other work, such as a ticket taker, checker,

and toll collector. (*Id.*) A report of contact form, dated January 7, 2008, agrees with the analysis from September 20, 2007 finding that Plaintiff "can do other less demanding work." (R. at 255.)

**F.      *Lifestyle Evidence***

In an undated Adult Function Report, Plaintiff stated that she spends her days by eating breakfast, lunch, and dinner; sitting or laying down while watching television or listening to music; and trying to do dishes. (R. at 218.) She has a pet that she tries to take outside for walks. (R. at 219.) Plaintiff noted that her conditions cause her to have trouble getting out of a bathtub, and that her husband has to help her shave her legs. (*Id.*) She does not prepare her own meals because her husband prepares them. (R. at 220.) Plaintiff reported that at times, she needs reminders to take care of personal needs and to take medications. (*Id.*) The only chores Plaintiff does are "dishes at times," and that this will take her from one to one and one-half hours. (*Id.*) However, her husband has to encourage her to do the dishes. (*Id.*)

Plaintiff stated that she will go outside two to three times on good days but will not stay out for long. (R. at 221.) She can drive a car for short distances and can ride in a car. (*Id.*) Two to three times per month, she goes shopping for food with her husband. (*Id.*) Plaintiff is able to pay bills, count change, handle a savings account, and use a checkbook and money orders. (*Id.*) She talks to her mother twice a day and does not go anywhere on a regular basis. (R. at 222.)

In a second Adult Function Report dated November 25, 2007, Plaintiff noted that she has trouble dressing, getting out of bed, and getting off the toilet. (R. at 241.) Plaintiff only makes sandwiches because it hurts if she stands too long. (R. at 242.) She stated that she does not do any chores because of her pain. (R. at 242-43.) She reported not being able to pay bills, handle a savings account, or use a checkbook and money orders because her husband "does it all." (R. at

243.)

### III.   CONTENTIONS OF THE PARTIES

Plaintiff, in her motion for summary judgment, asserts that the ALJ "committed substantial legal error" in denying her applications for DIB and SSI.  (Pl.'s Mot. at 2.)  Specifically, Plaintiff alleges that:

- The ALJ erred in finding that Plaintiff did not meet Listing 1.04(A) for a disability for spinal impairment;

- The ALJ erred in discounting the opinion of Plaintiff's treating physician; and

- The ALJ erred by not finding Plaintiff disabled because of pain alone.

(*Id.* at 5-12.)  Plaintiff asks the Court to reverse the ALJ's decision and grant her disability benefits from an onset date of March 14, 2006.  (*Id.* at 15.)

The Commissioner, in his motion for summary judgment, asserts that the ALJ's decision "is supported by substantial evidence and should be affirmed as a matter of law."  (Def.'s Mot.) Specifically, the Commissioner alleges that:

- Substantial evidence supports the ALJ's decision that Plaintiff cannot meet Listing 1.04(A) because she lacks the required neurological deficits;

- The ALJ properly rejected Dr. Schultz's opinion concerning Plaintiff's disability; and

- The ALJ complied with all regulations in determining that Plaintiff was not fully credible.

(Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br."), ECF No. 10 at 5-10.)

### IV.   STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.   DISCUSSION

### A.   *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520, 416.920 (2011).]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920 (2011). If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. *Id.*

**B.**     *Discussion of the Administrative Law Judge's Decision*

Utilizing the five-step sequential evaluation process outlined above, the ALJ made the following findings:

1.     **The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.**

2.     **The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 416.920(b)).**

3.     **The claimant has the following severe impairments: residuals, status post L4-L5 lumbar laminectomy with right L4-L5 microdiscectomy and L4-L5 instrumentation and interbody fusion; degenerative changes of the lumbar spine with mild to moderate degree of stenosis; and obesity (20 CFR 404.1520(c) and 416.920(c)).**

4.     **The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

5.     **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work; requires a sit/stand option throughout the workday; can perform all postural movements on an occasional basis, except cannot climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to vibration and hazards, such as dangerous, moving machinery and unprotected heights.**

6.     **The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).**

7.     **The claimant was born on September 6, 1963 and was 42 years old ono the alleged disability onset date, which is defined as a younger individual (20 CFR 404.1563 and 416.963).**

8.     **The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

9.     **Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568 and 416.968).**

10.      **Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).**

11.      **The claimant has not been under a "disability," as defined in the Social Security Act, from March 14, 2006 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

## C.    *Substantial Evidence Supports the Administrative Law Judge's Decision*

### 1.    The ALJ Correctly Determined that Plaintiff Does Not Meet Listing 1.04(A) for a Spinal Impairment

As her first assignment of error, Plaintiff alleges that the ALJ erred by not finding Plaintiff disabled for a spinal impairment pursuant to Listing 1.04(A). (Pl.'s Br. at 9-10.) Specifically, Plaintiff suggests that the ALJ improperly discounted the medical evidence from Drs. Sella and Korzi. (*Id.* at 6-9.) However, Plaintiff's argument is without merit because the ALJ properly weighed the findings of Drs. Sella and Korzi and properly found that Plaintiff did not meet the requirements of Listing 1.04(A).

Plaintiff bears the burden of proving that she meets all of the requirements of a listing. *See* 20 C.F.R. §§ 404.1512(a), 404.1525(c)(3), 416.912(a), 416.925(c)(3). As explained by the United States Supreme Court, the Listing of Impairments is intentionally designed to be a more rigorous standard of disability:

> The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity." The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work.

*Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (internal citations omitted).

To meet Listing 1.04(A), a claimant must demonstrate a disorder of the spine or spinal cord with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A) (2011). An example of a spinal disorder is spinal stenosis. *Id.* When evaluating whether a claimant meets one of the listed impairments, the ALJ must identify the relevant listings and then compare each of the listed criteria to the evidence of the claimant's symptoms. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). "*Cook*, however, does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases." *Russell v. Chater*, No. 94-2371, 1995 WL 417576, at *3 (4th Cir. July 7, 1995). The ALJ's duty of explanation is satisfied when he provides findings and determinations sufficiently articulated to permit meaningful judicial review. *See DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

Here, the ALJ determined that Plaintiff has a severe impairment resulting from "degenerative changes of the lumbar spine with mild to moderate degree of stenosis." (R. at 16.) This would satisfy Listing 1.04(A)'s requirement that the claimant demonstrate a disorder of the spine or spinal cord. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04. However, the ALJ determined that Plaintiff's "back condition is not attended by the degree of neurological deficit required by Section 1.04 of Appendix 1. The undersigned further finds that this condition does not result in an inability to ambulate effectively, as defined in Section 1.00B2b of Appendix 1." (R. at 20.) Plaintiff now alleges that the record contains sufficient evidence of her neurological deficits and that this evidence was "improperly ignored and discounted by the ALJ." (Pl.'s Mot. at 6.)

### a. Substantial Evidence Supports the ALJ's Rejection of Dr. Korzi's Opinion

The regulations governing the Social Security Administration ("Administration") set forth what qualifies as an "acceptable medical source" for determining whether a claimant has a "medically determinable impairment." 20 C.F.R. §§ 404.1513(a); 416.913(a). Under these regulations, a chiropractor is classified as an "other source," not as an "acceptable medical source." 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1); *see also Lee v. Sullivan*, 945 F.2d 687, 691 (4th Cir. 1991) ("At best, [a chiropractor's] assessment can qualify only as a layman's opinion."). The Administration "**may** also use evidence" from other sources, such as chiropractors, "to show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work." 20 C.F.R. §§ 404.1513(d), 416.913(d) (alterations in original) (emphasis added); *see also Plunkett v. Astrue*, No. 2:10-cv-41, 2011 WL 1516067, at *5 (W.D. Va. Apr. 20, 2011); *Gray v. Astrue*, No. 7:09-cv-282, 2010 WL 3943746, at *6 (W.D. Va. Oct. 7, 2010). Therefore, an ALJ can properly reject a chiropractor's opinion when considering whether a claimant has an impairment. *See Plunkett*, 2011 WL 1516067, at *5.

Here, the ALJ noted that Dr. Korzi's opinion was not an "acceptable medical source to establish whether a claimant has a medically determinable impairment." (R. at 22.) The ALJ specifically noted Dr. Korzi's determination that Plaintiff has "decreased range of motion of the back, sensory deficit, and motor deficit." (*Id.*) However, the ALJ properly did not consider this opinion in determining whether Plaintiff has a medically determinable impairment or whether Plaintiff meets the requirements of Listing 1.04(A). *See* 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1); *see also Plunkett*, 2011 WL 1516067, at *5. Plaintiff is not alleging that the ALJ improperly discounted Dr. Korzi's opinion in determining the severity of Plaintiff's impairments and

their effect on her ability to work; therefore, substantial evidence supports the ALJ's decision.

Furthermore, even if Dr. Korzi's opinion qualified as an "acceptable medical source," the ALJ properly discounted her opinion because it is inconsistent with other substantial medical evidence in the record. In particular, Dr. Korzi determined that Plaintiff had a 4% sensory impairment and a 3% motor impairment. (R. at 395-96.) Dr. Korzi also noted a positive straight-leg raising exam. (R. at 399.) However, Dr. Schultz's treatment notes–many from appointments occurring **after** Dr. Korzi's examinations of Plaintiff–reveal multiple negative straight leg raising tests and normal motor and sensory functions. (*See, e.g.,* R. at 459, 460, 462, 465, 467, 469, 470, 473, 477, 480, 530.) Therefore, because the ALJ was not required to consider Dr. Korzi's chiropractic opinion in determining whether Plaintiff meets the requirements of Listing 1.04(A), and because Dr. Korzi's opinion is inconsistent with other substantial medical evidence, the undersigned finds that the ALJ assigned proper weight to Dr. Korzi's opinion.

### b. Substantial Evidence Supports the Weight the ALJ Assigned to Dr. Sella's Opinion

Under the regulations, a consultative source is an "acceptable medical source" even though it is a non-treating source. *See* 20 C.F.R. §§ 404.1502, 416.902. If any medical opinion is inconsistent with other evidence in the record, the Administration weighs all evidence to determine whether a claimant is disabled. The Administration uses the  following factors to determine the weight given to each opinion: 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the supportability of the opinion; 4) the consistency of the opinion with the record; 5) the degree of specialization of the physician; and 6) any other factors which may be relevant, including understanding of the disability programs and their evidentiary requirements. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Here, the ALJ noted that Dr. Sella saw Plaintiff for a consultative examination on September 4, 2007. (R. at 24.) Therefore, Dr. Sella's opinion is an "acceptable medical source" but is not a treating source. 20 C.F.R. §§ 404.1502, 416.902. The ALJ discussed Dr. Sella's findings that Plaintiff was unable to perform straight leg raising because of pain. (R. at 24; *see also* R. at 504.) Dr. Sella also found that Plaintiff had numbness in her lower extremities after the surgery, but that this was improving with time. (R. at 24, 504.) Furthermore, he specifically noted "decreased motor responses and sensory responses." (*Id.*) However, like Dr. Korzi's opinion, Dr. Sella's opinion is inconsistent with other substantial medical evidence. Dr. Schultz–who is Plaintiff's treating physician–often noted negative straight leg raising tests and normal motor and sensory functions. (*See, e.g.,* R. at 459, 460, 462, 465, 467, 469, 470, 473, 477, 480, 530.)

In sum, the ALJ properly weighed the opinions of Drs. Korzi and Sella. Dr. Korzi's opinion was not an acceptable medical source to use to establish the existence of an impairment. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1); *see also Lee*, 945 F.2d at 691. Furthermore, Dr. Sella's opinion is inconsistent with other substantial medical evidence, particularly Dr. Schultz's treating notes. Therefore, the undersigned finds that substantial evidence supports the ALJ's finding that Plaintiff does not meet the requirements of Listing 1.04(A) for a spinal impairment.

## 2. The ALJ Assigned Proper Weight to Plaintiff's Treating Physician's Opinion

As her second assignment of error, Plaintiff alleges that the ALJ should have "given some weight" to the opinion of Dr. Schultz, Plaintiff's treating physician. (Pl.'s Mot. at 10.) Specifically, Plaintiff argues that the ALJ should have honored Dr. Schultz's opinion that Plaintiff is unable to work and the functional capacity evaluation he performed on Plaintiff. (*Id.* at 11.) The undersigned finds that Plaintiff's argument is without merit because Dr. Schultz's opinion is inconsistent with

other substantial evidence contained in Plaintiff's case record.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996). When an ALJ does not give a treating source opinion controlling weight and determines that the claimant is not disabled, the determination or decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). However, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. § 416.927(e)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5.

If a treating physician's opinion is not given controlling weight, the following factors are used to determine the weight given to the opinion: 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the supportability of the opinion; 4) the consistency of the opinion with the record; 5) the degree of specialization of the physician; and 6) any other factors which may be relevant, including understanding of the disability programs and their evidentiary requirements. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

When an ALJ does not give a treating source opinion controlling weight and determines that the claimant is not disabled:

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. **This explanation may be brief.**

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (emphasis added). However, the ALJ does not need to specifically list and address each factor in his decision, so long as sufficient reasons are given for the weight assigned to the treating source opinion. *See Pinson v. McMahon*, No. 3:07-1056, 2009 WL 763553, at *11 (D.S.C. Mar. 19, 2009) (holding that the ALJ properly analyzed the treating source's opinion even though he did not list the five factors and specifically address each one).

As an initial matter, the portion of Dr. Schultz's letter stating that Plaintiff is "currently unable to work" and "will be unable to work in the future" is not entitled to controlling weight. As discussed above, determining whether a claimant is disabled and unable to work is a determination reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *see also Morgan v. Barnhart*, 142 F. App'x, 716, 722 (4th Cir. 2005) (finding that physician's statement that claimant "can't work a total of an 8 hour day" is a legal conclusion with no evidentiary value). Because this portion of the letter is not medical evidence, the ALJ properly did not assign it controlling weight.

The undersigned finds that the ALJ assigned proper weight to Dr. Schultz's opinion because his functional capacity evaluation is inconsistent with other substantial evidence in Plaintiff's case record. In his evaluation, Dr. Schultz determined that Plaintiff can only stand/walk for one hour and sit for two hours during an eight-hour workday, and then can only do these for ten minutes at a time.

(R. at 555.)  Furthermore, Dr. Schultz found that Plaintiff could not use either of her feet for repetitive movement such as operating foot controls, and that she could never bend, twist, or turn at the waist; squat; crawl; climb; and push/pull.  (*Id.*)  Finally, Dr. Schultz noted that Plaintiff needed to lie down for at least two times per day for an hour to an hour and a half each time because of her condition and the effects her medications had on her.  (R. at 556.)

These findings, however, are not supported by Dr. Schultz's treatment notes.  Throughout his treatment of Plaintiff, Dr. Schultz often mentioned that Plaintiff displayed a normal gait (R. at 462, 467, 469-70, 473, 477, 480, 530); he never mentioned any complications that precluded Plaintiff's use of her lower extremities.  Furthermore, Dr. Schultz never mentioned any side effects Plaintiff was experiencing due to her medications; instead, his notes suggest that Plaintiff's pain symptoms were exacerbated when she did not take her medications as prescribed.  (*See, e.g.*, 460, 461, 465, 467, 475.)  In fact, Dr. Schultz's notes also detail times when Plaintiff described feeling much better and times when her pain was exacerbated after being manipulated for worker's compensation exams.  (*See, e.g.*, 460, 461, 462, 463, 464, 465, 467, 470, 530.)  While Dr. Schultz often described Plaintiff's range of motion as limited or decreased (*See, e.g.,* R. at 460, 463, 464, 465`, 467, 468470, 471), nothing in his notes suggest the severe postural limitations he concluded in his functional capacity evaluation of Plaintiff.

The undersigned also notes that Dr. Schultz's functional capacity evaluation is inconsistent with the assessments performed on Plaintiff by doctors from the state agency.  First, on September 4, 2007, Dr. Sella determined that Plaintiff can sit and occasionally stand and walk.  (R. at 504.)  Two weeks later, Dr. Franyutti, after performing a physical Residual Functional Capacity assessment, found that Plaintiff can frequently lift and carry ten pounds; stand and/or walk and sit

for a total of six hours in an eight-hour workday; and did not have any limitations on pushing and pulling, including the operation of hand and foot controls. (R. at 506.) He also determined that Plaintiff can occasionally climb ramps and stairs; balance; stoop; kneel; and crawl, but can never climb ladders, ropes, and scaffolds or crouch. (R. at 507.) On January 7, 2008, Dr. Gomez found the same limitations, except he noted that Plaintiff can occasionally crouch and could never crawl. (R. at 547-48.) Therefore, Dr. Schultz's evaluation is inconsistent with substantial evidence in the record, and the ALJ properly rejected his evaluation.

In his decision, the ALJ discussed many of these inconsistencies as support for his rejection of Dr. Schultz's opinions from April 2009. (R. at 27.) Specifically, the ALJ noted that Dr. Schultz's objective findings did not suggest that Plaintiff suffered from any deficits or abnormalities that would lead to an inability to use her lower extremities to operate foot controls and that would require the limitations on sitting, standing, and walking he suggested. (*Id.*) The ALJ also found that Dr. Schultz's notes did not support the degree of postural limitations, a limitation to Plaintiff's ability to work overhead, or any side effects from medications requiring Plaintiff to lay down during the day. (*Id.*) Furthermore, the ALJ discussed how Dr. Schultz's notes detail how Plaintiff had been feeling well during her last documented appointment and how she had been feeling well except at times when she did not take her medications or use her TENS unit. (R. at 26.) Therefore, the undersigned finds that the ALJ gave a sufficient explanation of the weight he assigned to Plaintiff's treating source opinion. *See Pinson*, 2009 WL 763553, at *11.

### 3. The ALJ Properly Evaluated Plaintiff's Credibility and Rejected Her Subjective Complaints of Pain

As her third assignment of error, Plaintiff alleges that the ALJ committed error by not finding Plaintiff disabled by pain alone. (Pl.'s Mot. at 14.) Specifically, Plaintiff argues that her "consistent

testimony related to pain" and the "statements of her primary treating physician" support a finding of disability from pain. (*Id.*)  However, Plaintiff's argument is without merit because the ALJ properly rejected her subjective complaints based on medical evidence and her daily activities.

The determination of whether a person is disabled by pain or other symptoms is a two-step process. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* 20 C.F.R. § 1529(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996).  First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence an impairment capable of causing the degree and type of pain alleged. *Craig*, 76 F.3d at 594.  Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. *Id.*  Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).  The determination or decision "must contain

specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984).

Neither Plaintiff nor Defendant dispute the ALJ's determination that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." (R. at 21.) Because the objective medical evidence indicates that Plaintiff does suffer from these conditions, the ALJ properly assessed the credibility of Plaintiff's testimony about her symptoms. *See Craig*, 76 F.3d at 585. In fact, the ALJ explicitly mentioned evidence pertaining to six of the seven factors. First, the ALJ considered the location, duration, frequency, and intensity of Plaintiff's pain and symptoms:

> In a personal pain questionnaire submitted on August 4, 2007, the claimant complained of constant back, hip and knee pain described as an aching, burning, stabbing, stinging, and throbbing sensation. She reported that the pain was caused by nothing to everything. . . . At the hearing . . . the claimant complained of pain from the middle of her back down to her knees. She testified that her legs go numb all the time and that they occasionally go out from under her. . . . She testified that she has more "bad" days than "good" days and that on the "good" days her pain is at level 8.5.

(R. at 21.) She then discussed factors that aggravate Plaintiff's symptoms by stating that Plaintiff "complained of increased back and lower extremity pain after sitting for ten minutes or standing for five to ten minutes." (*Id.*) Third, the ALJ noted that Plaintiff "reported that her prescribed medication did not provide much relief and that it made her tired when she took it three times a day." (*Id.*) Fourth, the ALJ mentioned Plaintiff's testimony that she uses a TENS unit three times

per week for six hours and that she also does home exercises. (*Id.*) Fifth, the ALJ noted Plaintiff's testimony that "to relieve her pain she must lay with pillows propped under her and that she must lie down twice a day for a period of 60 to 90 minutes." (*Id.*) Finally, the ALJ stated that in a function report submitted on November 25, 2007, Plaintiff "complained of difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs," and also "concentration difficulties and problems completing tasks." (*Id.*)

After discussing the factors, the ALJ then discussed medical and non-medical evidence which is inconsistent with Plaintiff's subjective complaints, including:

- Plaintiff alleged an onset date of disability, March 14, 2006, more than one year after her back surgery on February 15, 2005. (R. at 21.)

- Plaintiff told her surgeon, Dr. El-Kadi, that she felt fifty percent better two months after her surgery; Dr. El-Kadi advised her to continue physical therapy and work hardening to help with the pain. (R. at 21-22.) Despite this, Plaintiff did not include documentation of physical therapy appointments after her last visit with Dr. El-Kadi. (R. at 22.)

- On December 14, 2005, Plaintiff told Dr. Schultz that she was enjoying her sedentary work at her job. (R. at 22.) Dr. Schultz found that Plaintiff had a normal neurological examination with normal gait and normal motor and sensory functions. (*Id.*)

- On May 13, 2006, Plaintiff told Dr. Schultz that she had decided to quit her job to travel on the road with her husband in his new job for a trucking company. (R. at 23.) She also reported just returning from a ten-day vacation to Georgia and that she had "good relief" of pain from prescribed medications. (*Id.*)

- On multiple occasions, Plaintiff told Dr. Schultz that she was feeling better. (R. at 23-24.)

- On July 31, 2007, Plaintiff told Dr. Schultz that even though she had been feeling worse during the prior two months, she had not been using her TENS unit. (R. at 24.)

- Dr. Schultz's notes reflect that Plaintiff never complained of numbness in her lower extremities; these notes contradict her complaints to Dr. Sella, the consultative examiner. (R. at 25.)

- Overall, Dr. Schultz's notes reflect that Plaintiff had "no neurological deficit or gait abnormality during the period in question." (R. at 25.)

- At Plaintiff's last documented visit with Dr. Schultz on October 22, 2007, Plaintiff reported feeling "pleased' with her progress and that she was feeling "better overall." (R. at 25.) Dr. Schultz advised her that she may have occasional exacerbations, and he noted that Plaintiff had a normal neurological examination with normal gait. (*Id.*)

After considering this evidence, the ALJ found that Plaintiff "has exaggerated the nature and extent of her impairments and that her complaints of disabling pain and functional limitations are not fully credible." (R. at 25.) Specifically, the ALJ noted that even though Plaintiff has had some exacerbation of pain, she has improved with "conservative treatment." (R. at 26.) Furthermore, Dr. Schultz's notes did not describe any side effects from Plaintiff's medications. (*Id.*) The ALJ also determined that Plaintiff's statements that she quit her job because of pain were not credible in light of her statements and Dr. Schultz's notes detailing that Plaintiff was not being asked to work as extra help, that she had failed to obtain other jobs in the hospital, and that she wanted to travel with her husband when he was traveling as a truck driver. (*Id.*) Because the ALJ adequately supported his credibility determination with evidence from Plaintiff's own testimony, as well as objective findings from the records, the undersigned finds that substantial evidence supports the ALJ's credibility

determination.

## VI. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 8) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 9) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **14th** day of **November**, **2011.**


_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE